UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>           Plaintiff,<br><br>      v.<br><br>Mark Suleymanov<br><br>           Defendant. | Civil Action No. 18-6854 |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendant Mark Suleymanov ("Suleymanov" or "Defendant"), and alleges as follows:

## SUMMARY OF ALLEGATIONS

1. Between at least early 2012 and early 2016, Suleymanov engaged in the fraudulent unregistered offer and sale of binary options securities over the internet. Suleymanov, who was doing business as SpotFN and a number of other brands, raised at least $4 million from retail investors, some of whom were senior citizens without investment experience. As a result of the scheme, investors suffered losses, including losses of retirement funds, which SpotFN encouraged investors to use.

2. Suleymanov operated a SpotFN website and other related websites, which misrepresented the profitability of investing in binary options using SpotFN's platform, as well as investors' ability to access their funds. In reality, Suleymanov used software to manipulate investors' trading results to increase investor losses. In addition, Suleymanov caused many investors to be unable to withdraw any significant amount of their funds.

1

3. The SpotFN website also falsely stated that an investor's funds would be held in a segregated account and used only for trading options, not for SpotFN's business expenses. In fact, investors' funds were commingled in bank accounts controlled by Suleymanov, who misused certain investor funds for both business and personal expenses.

4. By engaging in the conduct described in this Complaint, Suleymanov violated the antifraud provisions of the federal securities laws, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and the registration provisions of the federal securities laws, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)] and unless restrained and enjoined will again engage in violations of these provisions.

5. The Commission seeks an order enjoining Suleymanov from further violations, requiring Suleymanov to disgorge his ill-gotten gains plus prejudgment interest, and imposing monetary penalties.

## JURSIDICTION AND VENUE

6. The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

7. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

8. The Defendant, directly and indirectly, used the means or instrumentalities of interstate commerce or of the mails, in connection with the acts, practices, and courses of business described in this Complaint.

9. Venue is appropriate in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the offers and sales of securities, and acts and transactions constituting the violations alleged in this Complaint, occurred in the Eastern District of New York, and Suleymanov resides and transacts business in the District.

## DEFENDANT

10. Mark Suleymanov, age 38, is a resident of Glen Cove, New York. Suleymanov did business as SpotFN, an unincorporated entity offering and selling binary options over the internet. Suleymanov established the SpotFN.com website, as well as related websites such as BinaryAcademics.com, AssetSignals.com, BinaryFN.com, and OptionsMogul.com, among others. He opened and controlled bank accounts to which investors sent their money. Suleymanov also controlled the risk settings on software that caused investors to lose money they had invested in SpotFN binary options.

## FACTS

**Suleymanov Created a SpotFN Website, and Related Websites, to Sell Binary Options Securities**

11. Between at least early 2012 and early 2016, Suleymanov offered and sold binary options securities to customers throughout the United States through a number of different public websites, including SpotFN.com, BinaryFN.com, and OptionsMogul.com, among others (collectively, "SpotFN"). Each of these web domains was registered to and controlled by Suleymanov. The SpotFN web domains included BinaryAcademics.com, which purported to sell educational materials that would supposedly improve an investor's performance, and AssetSignals.com, which purported to sell trading "signals," or tips on market movements, that would also supposedly improve investors' trading results. Via these "educational" sites,

Suleymanov encouraged investors to make more trades on the SpotFN platform, which resulted in investors incurring more losses.

12. The SpotFN binary options were options contracts of short duration that were based on the price of stocks and stock indexes, or other financial assets. A binary option's payout depended on the outcome of a "yes/no" proposition. For example, SpotFN offered and sold binary options in which an investor would choose whether a given stock's price would be above or below a specified price at a specified time. When the option expired, the investor would either earn a pre-determined amount if he chose correctly, or he would earn nothing and forfeit the amount of his investment if he chose incorrectly. Binary options are securities within the meaning of the Securities Act and Exchange Act when they take the form of options based on the value of a security or index of securities.

13. Investor funds were sent, either by wire or via credit card processors, into bank accounts that had been opened and were controlled by Suleymanov. Suleymanov received approximately $4 million in investor funds through these accounts.

14. Suleymanov caused SpotFN's website to falsely represent that SpotFN was a legitimate incorporated entity with officers and directors, when in fact, for most of its existence, it was not. Suleymanov also caused SpotFN's website to misleadingly feature the NASDAQ logo, despite the fact that SpotFN's binary options were not traded on NASDAQ or any other regulated exchange.

## Unregistered Offers and Sales of SpotFN Binary Options

15. Under Section 5 of the Securities Act [15 U.S.C. § 77e], it is unlawful for any person, directly or indirectly, to offer or sell securities using the U.S. mails or interstate commerce, unless (1) the offer or sale is registered with the SEC pursuant to a valid registration statement

that applies to that specific offering; or (2) the offer or sale is specifically exempt from the registration requirements of Section 5.

16. No registration statement was filed or in effect as to the offer and sale of binary options through the SpotFN websites. In addition, no exemption from the registration requirement applied. Suleymanov directly sold the securities via SpotFN, creating and maintaining the websites through which the securities were offered and sold.

**Suleymanov Made Material Misrepresentations and Engaged in a Fraudulent Scheme**

**A.  Suleymanov Misrepresented that Binary Options Trading Would Be Profitable**

17. On the SpotFN websites, Suleymanov made false statements about the significant and sustainable profits that investors could expect from trading binary options using SpotFN's platform, and about SpotFN's motivation to have clients' trading be successful. For example, the SpotFN.com website stated:

- "Up to 88% Return."
- "[Clients] will be able to have their investment account become a self-sufficient, lifelong source of funds accessible when needed at any time."
- "The final result is to have clients be able to withdraw on a consistent basis, without affecting their ever-growing account balance."
- "At SpotFN, we want our clients to be able to attain a constant source of income."
- "We are looking to create longstanding sustainability for our clients that will be shown by the growth of their portfolios."
- "We are highly motivated to make our clients as successful as possible in trading for the very reason that your success is our success."

18. These statements were materially false and misleading because Suleymanov in fact caused losses for investors. In contrast to the "up to 88% return" that the site touted, many investors ultimately lost all, or nearly all, of their invested capital. One investor's account experienced an ultimate win rate of only 38%, resulting in the loss of his entire account balance.

Other investors experienced similarly dismal results, with the same ultimate outcome: depleted accounts, no matter how much they invested.

### B. Suleymanov Engaged in Deceptive Conduct to Cause Losses for Investors

19. As part of a scheme, Suleymanov engaged in deceptive conduct to cause losses for investors. One way that he achieved this was through the SpotFN trading model. The trading model worked in the following way: when investors placed a losing trade, they forfeited 100% of the amount of that trade. When they placed a winning trade, they typically received 70-80% of the amount of the trade. Because the amount of a loss was larger than the amount of a gain, on average, assuming a 50% win rate, an account would cumulatively lose value the more it was traded.

20. In addition, Suleymanov used a restrictive withdrawal policy to encourage SpotFN customers to place a large volume of trades which would lead to more losses. Although the website stated that the client's success meant SpotFN's success, the truth was just the opposite. The funds that the customers lost, SpotFN gained.

21. Suleymanov also acted behind the scenes and used software to manipulate the rates at which customers won or lost trades. Suleymanov admitted in a February 2016 email to the company that sold him the software that he used it to give new customers high rates of winning trades initially to encourage them to invest more funds, then he adjusted the setting so the investors would experience losses. Suleymanov stated:

> "We use that as a marketing tool to lure customers in for the first time, get them to deposit as much as possible, let them win… then once all their funds and wires come in, we then turn that feature into a positive for the platform. …We are controlling the situation with them. The wins are their way of bringing in the funds to the company. We discussed this… that clients will be given bonuses in the beginning to see how easy they can win. But again, once the funds are in, that setting gets adjusted to a loss for them. This is not our first day at the park with this."

6

### C.  Suleymanov Falsely Promised Investors Easy Access to Their Funds

22. Suleymanov caused the SpotFN websites to promise investors "hassle free withdrawals" that were "fast and secure." One of SpotFN's selling points was that investments would generate profits that would be "accessible when needed anytime." In reality, however, Suleymanov caused many investors to be unable to withdraw any significant amount of their funds.

23. Suleymanov's primary technique for retaining investors' money was SpotFN's so-called bonus policy. When investors opened accounts, SpotFN frequently credited them with "account bonuses," credits which increased an investor's trading account balance beyond what he had personally funded. In some cases, investors recalled being offered these bonuses as an inducement to fund a certain amount into their accounts, but in other cases, investors simply discovered that the amounts had been added without their consent. Investors were not warned that the bonus money came with consequences: that every bonus dollar in an account had to be traded thirty times before SpotFN would approve any withdrawal request from that account. When an investor placed a withdrawal request for funds from his account, SpotFN would often cancel the request, citing this policy.

24. Some investors increased the volume of trading in their accounts, in order to be eligible for cash withdrawals. However, increased trading volume meant that the investors' account balances depleted quickly as a result of trading losses.

25. Some investors received other excuses as to why their requested withdrawals never arrived. These excuses ran the gamut from supposed bank errors, to computer failures, to frozen accounting software, to accidental misrouting to the wrong account. A few investors did receive some amount of withdrawal or refund, after the investor threatened to pursue a fraud claim or charge-back against SpotFN with their bank or credit card company.

26. The SpotFN websites are no longer operational. Once the websites were removed from the internet in early 2016, investors found that their telephone calls and emails to SpotFN were no longer answered. Since investors' only access to their accounts had been through the SpotFN websites, all ability for investors to access or view their account balances, trade or transaction history, or any other data, vanished along with the site. There was no advance warning that SpotFN would be going out of business, and no procedure for investors to get refunds of the balances in their accounts.

### D. Suleymanov Misrepresented That Investors' Funds Were Held in Segregated Accounts and Used Only for Trading Binary Options

27. Suleymanov caused the SpotFN website to state that: "Upon receipt of your deposit(s), SpotFN will place your trading capital into one or more segregated client account(s)." The website stated that the funds could not be used in the course of SpotFN's business, adding, "Funds are used only for trading options through our website upon client's instructions and are never used for any other cause." The website also stated, "SpotFN's Compliance Department ensures that your deposited funds and trading profits are secure," adding that "the Compliance department specializes in combating fraud and money laundering, ensuring that your funds are always protected."

28. Contrary to these representations, SpotFN did not have a Compliance Department, and investors' funds were not placed into segregated accounts. When investors transferred money to SpotFN to fund their SpotFN trading accounts, their money was actually commingled in several bank accounts that were opened and controlled by Suleymanov. This was material because investors' funds were not used as represented; the funds were not secure or protected as promised; and Suleymanov had access to investors' funds to use for his own purposes, which was not disclosed to the investors.

### E. Suleymanov Misused Investor Funds

29. Suleymanov misused certain investor funds. Instead of ensuring that investors' funds were used only for the trading of options as the SpotFN website had claimed, Suleymanov used some of these funds to pay business expenses, such as the payment of salary and other compensation to employees, as well as personal expenses, such as payments on his personal mortgage. In addition, Suleymanov wrote checks from these accounts to his family members, and made transfers from these accounts to other business entities that he controlled, ultimately draining each account of funds.

### **CLAIM ONE**

### **Violations of Section 17 of the Securities Act**

30. The Commission re-alleges and reincorporates paragraphs 1 through 29 as if fully set forth herein.

31. Defendant, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, and acting with the requisite degree of knowledge or state of mind: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

32. By engaging in the conduct described above, Suleymanov violated, and unless restrained and enjoined will again violate, Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## CLAIM TWO

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

33. The Commission re-alleges and reincorporates paragraphs 1 through 29 as if fully set forth herein.

34. Defendant, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon persons.

35. By engaging in the conduct described above, Defendant violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## CLAIM THREE

### Violations of Section 5 of the Securities Act

36. The Commission re-alleges and reincorporates paragraphs 1 through 29 as if fully set forth herein.

37. Defendant, by engaging in the conduct described above, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell binary options securities when no registration statement was in effect as to such securities, and no exemption from registration was available.

38. By reason of his actions alleged herein, Defendant violated, and unless restrained and enjoined, will again violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

A. Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

B. Permanently enjoining and restraining Defendant from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

C. Ordering Defendant to disgorge ill-gotten gains obtained as a result of the conduct alleged in this Complaint, with prejudgment interest;

D. Ordering Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

E. granting such further relief as the Court deems just and appropriate.

Dated this 3rd day of December 2018.

/s/ Ian Dattner

Ian Dattner (NY 4411187)
Natalie E. Shioji (NY 4662847)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel: (202) 551-4763

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION

Of Counsel:
Lisa Weinstein Deitch (CA 137492)
Division of Enforcement
Securities and Exchange Commission